THOMAS, Judge.
John Robert Flomer, Jr. (“the father”), and Lynn Flomer (“the mother”) were divorced in 2001. At the time of their divorce, the father and the mother (referred to at times collectively as “the parents”) negotiated a settlement agreement. That agreement contained the following postmi-nority-educational-support provision for the benefit of their then minor daughter, Jessica, who is now married and known by the name Jessica Farthing (“the daughter”): “For the support and maintenance of the [daughter], [the father] shall pay and be responsible for all reasonable costs of her post-secondary education. The [parents] agree to make reasonable efforts to obtain grants and/or scholarships for the [daughter].” The parents’ agreement was incorporated into the divorce judgment entered by the court.
In November 2006, the trial court entered a judgment on a petition seeking the modification of custody of the parents’ remaining minor child and seeking a finding of contempt. The pleadings instituting the modification/contempt action are not contained in the record on appeal. However, the judgment contains the following statement: “Father shall continue to pay for the daughter’s ... college tuition, books and fees.”
The daughter began her postsecondary studies at Auburn University at Montgomery in 2003. She completed the necessary prerequisites for pharmacy school and then transferred to pharmacy school at Auburn University in 2004. She married in 2005.
In May 2008, the daughter, graduated from pharmacy school. On or about October 8, 2008, the daughter sent the father a letter informing the father that her student loans were about to become due and seeking from the father $62,000, plus interest, for tuition that had not been covered by scholarships or grants. The letter requested that the father respond to the letter within three days; although he eventually replied via electronic mail, the father did not respond within three days.
On October 24, 2008, the daughter filed a petition seeking to have the father held in contempt for his failure to comply with the postminority-educational-support provision incorporated into the parents’ divorce judgment, which made the father responsible for the reasonable costs of the *39 daughter’s postsecondary education. As noted above the father eventually responded to the daughter’s written request that he pay $62,000, plus interest, as required under the divorce judgment. His electronic-mail reply to the daughter indicated that he would pay the tuition and expenses that he was responsible for, but he requested receipts to prove that the $62,000, plus interest, the daughter requested he pay was actually incurred for tuition and other associated educational expenses. The father also stated in his response that he did not think that he was responsible for “any ... post-graduate tuition and books” or for any tuition after the daughter was married in 2005.
The father moved to dismiss the daughter’s petition, arguing that the fact that the daughter was not a party to the parents’ divorce action resulted in the daughter’s lacking standing to bring the contempt petition and, thus, in a lack of a justiciable controversy. After a hearing on the matter, at which the parties agreed that the daughter was an intended third-party beneficiary to the settlement agreement made by the parents and incorporated into their divorce judgment, the trial court reserved ruling on the motion to dismiss and set the case for a trial. The father filed an answer in July 2009; he also filed a counterclaim in which he sought compensatory and punitive damages for the daughter’s alleged intentional infliction of emotional distress for her failure, among other things, to invite the father to her pharmacy-school graduation or to her wedding. That counterclaim was severed from the contempt proceeding and is not relevant to the issues on appeal.
The trial court held a trial on July 9, 2009, at which the father and the daughter testified. The trial court determined, based in part on the father’s admission that he was required to pay for the daughter’s undergraduate tuition, books, and fees, that the father was responsible for paying $74,481.82, plus 5.375% interest on the balance after the date of the judgment, on the daughter’s outstanding loans. The trial court then determined that the father was in contempt for failing to pay for the daughter’s education and ordered, as a result, that the father pay a $1,500 attorney fee to the daughter’s attorney. The father filed a postjudgment motion, which the trial court denied after hearing arguments. The father appeals.
“This court recognizes that when the trial court’s judgment is based on ore tenus evidence, that judgment is presumed correct and is not subject to reversal unless it is so unsupported by the evidence that it is plainly and palpably wrong. Berry v. Berry, 579 So.2d 654 (Ala.Civ.App.1991). However, there is no presumption of correctness in the trial court’s application of the law to the facts. Gaston v. Ames, 514 So.2d 877 (Ala.1987).
“This case involves an agreement, executed by the parties, that was incorporated into the parties’ divorce judgment, in which the father had agreed to pay the requested postminority support. Judgments of divorce are to be interpreted or construed as other written instruments are. Dees v. Dees, 581 So.2d 1103 (Ala.Civ.App.1990). The words of the agreement are to be given their ordinary meaning, and the intentions of the parties are to be derived from them. Vainrib v. Downey, 565 So.2d 647 (Ala.Civ.App.1990). Further, if the terms of the judgment are not ambiguous, they should be given their usual and ordinary meaning. McClure v. Cassady, 426 So.2d 430 (Ala.Civ.App.1982).”
Amie v. Conrey, 801 So.2d 841, 846 (Ala. Civ.App.2001).
*40 The daughter testified at trial that she had attended Auburn University at Montgomery (“AUM”) and then Auburn University, where she completed pharmacy school. She said that she had received grants to fund some of her schooling at AUM but that she did not receive any grants for pharmacy school. According to the daughter, she had amassed $133,113.85 in student loans and interest on those loans between 2003 and 2008. The daughter said that she had told the father when she began her studies at AUM that she would probably need student loans to pay for school. She said that he told her to get the loans in her name and that “we” would pay them later. She said that she was required to begin repayment of the loans in December 2008. The daughter testified that her tuition expenses were $62,009.91, that her books had cost between $400 and $500 each semester, and that her half of the monthly rent she and her husband had paid from 2005 until she completed pharmacy school in May 2008 was $200. The daughter had resided with the mother before her marriage in 2005, so she claimed no room-and-board expenses before 2005.
The daughter explained that she had sent the father a letter dated October 8, 2008, requesting that he assist with a portion of the student loans. She said that she had sent it in a manner that required the father’s signature to pick up the letter; she said that she knew that it took him a while to pick it up. She said that he did not respond to her letter for two months and that, when he did respond, he sent the response by electronic mail. She admitted that, in his response, the father had requested documentation; she said that she did not send documentation because the father had indicated that he did not intend to pay and because she thought that the matter would be decided in court. The daughter further admitted that she had never told the father what he needed to pay at any time before she sent the letter in October 2008, shortly before she instituted the contempt action.
According to the daughter, she had originally planned to seek a career as a doctor, so, she said, her father was aware that she would need additional schooling after college. The daughter said that she had changed her mind and had decided to seek a pharmacy degree instead; she admitted that her father did not know that she had decided to attend pharmacy school. The daughter explained that she had not received an undergraduate degree; she said that she had completed the necessary prerequisites for pharmacy school at AUM and then had transferred to pharmacy school at Auburn University in August 2004 without first graduating from college.
The father testified that he was employed and that he earned “over six figures.” He indicated that he was not concerned about “the money.” The father admitted that he owed the daughter for any expense related to undergraduate classes, but, he said, he never thought that he would be required to pay for graduate school for the daughter. The term “post-secondary,” he said he had thought, meant “pre-graduate” and encompassed only a “normal” college education. He also denied knowing that the daughter had ever contemplated attending medical school. He did testify, however, that he “thought that [he] knew” that the daughter was in pharmacy school at the time of the 2006 modification/contempt trial.
The father said that he had not paid any of the daughter’s postminority educational expenses because he had not been informed of what those expenses were; he said that he had never been presented with any bill for any expense and that he had not been provided any documentation *41 of the daughter’s claimed expenses until shortly before the trial. According to the father, he picked up the daughter’s October 8, 2008, letter from the post office on October 18. He said that his delay in responding to the letter resulted from his desire to have his mother review his response for him. He admitted that he did not send the response to the daughter via electronic mail until December 1, 2008.
The evidence regarding the relationship between the father and the daughter was sparse because the trial court sustained an objection to a question regarding the relationship early in the trial and indicated that the subject would not be entertained. However, it was clear from other comments made by both parties that the two did not communicate with each other. The father indicated that he had not been able to contact the daughter via electronic mail even as far back as 2003 and 2004, because, he said, she “blocked” his correspondence. He said that he did not recall if he had tried to telephone or to reach the daughter via electronic mail since 2006.
On appeal, the father first argues that the daughter lacked standing to seek a contempt judgment under the parents’ divorce judgment. The father argues that the daughter’s remedy as a third-party beneficiary to her parents’ settlement agreement was to sue the father on a breach-of-contract theory. However, as the daughter points out, the settlement agreement lost its contractual nature once it was incorporated into and made a part of the divorce judgment. See Turenne v. Turenne, 884 So.2d 844, 848 (Ala.2003); Davidson v. Davidson, 580 So.2d 1362, 1363 (Ala.Civ.App.1991). Although the father cites caselaw indicating that a nonparty to a divorce judgment lacks standing to seek to invalidate the divorce judgment, see Waite v. Waite, 959 So.2d 610, 618-19 (Ala.2006), and Yerger v. Cox, 281 Ala. 1, 5, 198 So.2d 282, 286 (1967), we find those cases inapposite, because they involved challenges to the validity of a divorce judgment by a stranger to that judgment.
Rule 71, Ala. R. Civ. P., provides that, “[w]hen an order is made in favor of a person who is not a party to the action, other than a creditor of a party to a divorce proceeding, that person may enforce obedience to the order by the same process as if that person were a party....” The daughter is not a creditor of the father. She is admittedly the intended beneficiary of the postminority-educational-support provision in the parents’ divorce judgment. Moreover, the daughter, who took out loans in her own name to fund her postsecondary educational pursuits, was the only party entitled to a judgment in her favor for the amounts due; a judgment in favor of the mother would have been improper. See Dunigan v. Bruning, 64 So.3d 645, 654 (Ala.Civ.App.2010). We therefore conclude that the daughter did not lack standing to enforce the postminority-educational-support provision in the parents’ divorce judgment by initiating a contempt proceeding against the father.
The father next argues that the trial court erred by making him responsible for the postminority educational support of the daughter because, he argues, the daughter’s marriage and resulting emancipation should have extinguished his duty to pay that support. Although there is no doubt that marriage of a child emancipates that child, see Owens v. Owens, 412 So.2d 820, 822 (Ala.Civ.App.1982), an argument nearly identical to the father’s argument on this point has already been rejected by this court. See Smith v. Smith, 439 So.2d 1286 (Ala.Civ.App.1983). In Smith, the father argued that the marriage of his son extinguished his duty to pay the son’s educational expenses, which the father had *42 agreed to pay by an agreement incorporated into a divorce judgment. Smith, 489 So.2d at 1287. The father had agreed to pay educational expenses for the son “until (a) the [son] completes his undergraduate and postgraduate education, (b) voluntarily terminates his education, or (c) reaches twenty-six years of age, whichever event sooner occurs.” Id. This court noted that “the parties were free to bargain with one another [regarding the postminority-edu-cational-support obligation and that] their agreement contained] no language which would lead to a conclusion that they intended support payments to cease upon the marriage [of the son].” Id. at 1289. Because the agreement of the parties extinguished the father’s obligation on the happening of one of three predetermined circumstances, none of which was the marriage of the son, this court determined that the father’s obligation was not extinguished by the marriage of the son. Id.
The father in the present case likewise had the opportunity to negotiate for conditions or limitations in the agreement obligating him to pay for the postsecondary education of the daughter. The parents’ agreement did not place any limitations on the father’s duty to pay for the daughter’s education except for using the term “reasonable” to modify the word “costs.” The fact that the daughter was, indeed, emancipated upon her marriage has no bearing on this issue, because the daughter was already emancipated — that is, over the age of majority — before her marriage and the postminority-educational-support provision in the parents’ divorce judgment was intended to provide for the payment of the daughter’s educational expenses even after she reached the age of majority.[1] See Smith, 439 So.2d at 1289. The postminority-educational-support provision in the parents’ divorce judgment clearly does not contemplate that the father’s duty to pay support would be extinguished if the daughter married, so we cannot agree with the father that the trial court erred in not so concluding.
The father next argues that the postmi-nority-educational-support provision in the parents’ divorce judgment did not require him to fund the daughter’s graduate-level education. The father relies on the case-law that has developed since a parent’s duty to pay court-ordered postminority educational support was established in Ex parte Bayliss, 550 So.2d 986 (Ala.1989). He argues that a trial court is required to place reasonable limitations on a parent’s duty to pay postminority educational support; indeed, this court has long held that a trial court must impose a reasonable time limit for the attainment of a college education. See, e.g., Kent v. Kent, 587 So.2d 409, 413 (Ala.Civ.App.1991). Specifically, the father references Waddell v. Waddell, 904 So.2d 1275, 1281 (Ala.Civ.App.2004), in which this court determined that a court-imposed limitation that post-minority support continue for “a ‘reasonable period of time’ lack[ed] sufficient certainty.”
However, the father fails to recognize the distinction between court-imposed postminority educational support and a voluntarily assumed obligation to provide postminority educational support, the contours of which are not determined by the principles applicable to court-imposed postminority educational support but by the terms used in the agreement creating that obligation. See Thomas v. Campbell, 960 So.2d 694, 697 (Ala.Civ.App.2006) (“[T]he principles of Ex parte Bay- *43 liss, 550 So.2d 986 (Ala.1989), do not generally apply in the context of a parent’s contractual undertaking to provide postmi-nority support to minor children that is incorporated into a binding judgment”). As noted above, we explained in Smith that parents are free to negotiate their agreement regarding postminority educational support as they see fit. See Smith, 439 So.2d at 1289. Thus, the father cannot argue that the trial court erred in not imposing a reasonable limitation on his obligation to pay postminority educational support for the daughter; the trial court did not impose such an obligation upon the father in the judgment under review. Instead, the trial court only construed and enforced the postminority-educational-support provision in the parents’ divorce judgment in which the father voluntarily agreed to pay for the “post-secondary education” of the daughter.
In the provision creating his obligation, the father agreed to pay for the “post-secondary education” of the daughter. The father testified at trial that he thought that “post-secondary education” referred to only an undergraduate college degree. However, the term “post-secondary education” is more expansive, including education after the conclusion of a secondary, or high school, education. “Post,” used as a prefix, is defined as “after: subsequent: later,” Merriam-Webster’s Collegiate Dictionary 969 (11th ed.2003), and “secondary school” is defined as “a school intermediate between elementary school and college and usually offering general, technical, vocational, or college-preparatory courses.” Merriam-Webster’s Collegiate Dictionary 1121 (11th ed.2003). Thus, the term “post-secondary education” would refer to education occurring after the completion of a high-school education; the term does not specifically refer to or exclude any particular type of education like either an undergraduate education or a graduate education. Even assuming that the daughter’s pharmacy-school education, which does not require as a prerequisite an undergraduate degree, is a graduate-degree program, we are still unconvinced by the father’s argument because of the expansive terminology used in the postminority-educational-support provision in the parents’ divorce judgment. We conclude, therefore, that the trial court did not err in interpreting and enforcing the provision obligating the father to pay for the “post-secondary education” of the daughter when the trial court ordered that the father be responsible for all the daughter’s tuition, including the tuition for pharmacy school.
We turn now to the father’s argument that the trial court erred by requiring him to pay postminority educational support for his daughter despite the estrangement between them. The father is correct that, pursuant to Ex parte Bayliss and its progeny, a trial court considering the imposition of postminority educational support may consider as a factor the relationship between the child and his or her parents. See Dunigan, 64 So.3d at 651. We recently considered an argument like the father’s in Dunigan, in which we explained:
“Since the inception of judicially imposed postminority educational support, Alabama law has allowed a trial court to consider the relationship between the child and his or her parents and the child’s ‘responsiveness to parental advice and guidance’ when determining whether and to what extent to impose upon a parent the obligation of paying postminority educational support. Ex parte Bayliss, 550 So.2d 986, 987 (Ala.1989). However, this court, the court charged most often with the review of appeals involving postminority edu *44 cational support, ‘has repeatedly stated that the existence of a strained relationship between parent and child does not prevent the child from having the opportunity to obtain a college education.’ Stinson v. Stinson, 729 So.2d 864, 869 (Ala.Civ.App.1998). In the earliest of postminority-educational-support cases, we held that the lack of familial interaction between a father and his daughter ‘should not preclude the daughter, in this instance, from having the opportunity to obtain a college education.’ Thrasher v. Wilburn, 574 So.2d 889, 841 (Ala.Civ.App.1990). In no instance has this court reversed a trial court’s imposition of postminority educational support solely because the evidence at trial reflected that the relationship between parent and child was so broken as to be a complete impediment to the receipt of such support. But see Penney v. Penney, 785 So.2d 376, 381 (Ala.Civ.App.2000) (reversing a judgment denying postminority educational support on, among other grounds, the trial court’s determination that it must consider the relationship between the child and her parents when considering the imposition of postminority educational support). We have affirmed a trial court’s denial of postminority educational support using as partial support for the denial the daughter’s decision to live with her stepfather after the death of the mother and her decision to have little contact with her father and his new family despite the father’s attempts to establish a relationship with the daughter. See Newman v. Newman, 667 So.2d 1362, 1368-69 (Ala.Civ.App.1994). However, our opinion in Newman made clear that, although the trial court could have considered the poor relationship between the father and the daughter, evidence of that poor relationship ‘alone ... is insufficient to prevent [a child] from receiving assistance in going to college.’ Newman, 667 So.2d at 1368; see also West v. West, 875 So.2d 323, 325 (Ala.Civ.App.2003) (affirming the denial of postminority educational support when the evidence failed to indicate whether the child had the ‘commitment to and aptitude for college’ but admonishing the trial court for denying postminority educational support solely on the basis of the poor relationship between the parent and the child).”
Dunigan, 64 So.3d at 651-52. Thus, under Alabama law, the fact that a parent and a child are estranged will not alone serve to prevent or extinguish a child’s right to postminority educational support.
The father in the present case, unlike the father in Dunigan, is not seeking to have his obligation to pay postmi-nority educational support terminated as to future payments. In fact, his obligation has been terminated by the conclusion of the daughter’s postsecondary education. He does, however, seek to avoid payment of his already accrued postminority-edu-cational-support obligation on the ground that he and the daughter have been estranged for some time. Thus, the father does not seek prospective relief from his obligation based on a change in circumstances; rather, he seeks retroactive relief from his already accrued obligation based on what appears to be a longstanding estrangement from the daughter. A parent seeking to modify or terminate his or her obligation to pay postminority educational support may not be awarded retroactive relief as to support due before the date of the filing of the petition for modification or termination. See King v. Barnes, 54 So.3d 900, 905 n. 1 (Ala.Civ.App.2010) (“However, if a petition to modify a postminority-support obligation is granted, that modification does not retroactively relieve a parent of the support due for the period be *45 fore the filing of that petition.”); see also Fielding v. Fielding, 848 So.2d 766, 769 (Ala.Civ.App.2002). Thus, even were we to be convinced that the father’s “estrangement defense” had merit, he advanced it too late for it to be of any benefit to him.
Next, the father argues that the trial court erred in awarding the daughter $74,481.82, plus interest, in postminority educational expenses when, he says, the daughter has failed to prove all of her expenses. The father specifically challenges the trial court’s award of expenses for books to the daughter, because, he says, the daughter did not provide sufficient proof of those expenses and instead simply “estimated” them.[2] However, the daughter actually testified that she had spent between $400 and $500 on books each semester; based on her actual expenses, she said, she spent, on average, $450 per semester for six semesters on her books. Although the daughter’s testimony may not have been the most precise evidence of the amount she spent on her books, it was competent evidence of the money she spent each semester. See Johnson v. Langley, 495 So.2d 1061, 1065 (Ala.1986) (“It is the law in Alabama that testimony about payment of money is competent, ' and the fact that there may be written records goes to the probative value of such testimony, not its competency.”); see also Pody v. Pody, 416 So.2d 1028, 1029 (Ala.Civ.App.1982). The father cross-examined the daughter briefly about her book expenses; however, he did not present any challenge to her testimony that she had spent between $400 and $500 per semester on her books. Thus, we conclude that the trial court was free to accept the daughter’s testimony about her average book expenses.
The father also attacks the trial court’s finding of contempt and the resulting imposition of an attorney fee. He argues that the evidence did not establish that he was in contempt for failing to pay the daughter’s postminority-educational-support expenses when he had been notified of the daughter’s demand that he pay $62,000 only shortly before she instituted her action for contempt. He points out that the daughter had not provided him any documentation regarding her expenses until mere days before trial on the contempt petition.
“ ‘[W]hether a party is in contempt of court is a determination committed to the sound discretion of the trial court, and, absent an abuse of that discretion or unless the judgment of the trial court is unsupported by the evidence so as to be plainly and palpably wrong, this court will affirm.’
“Stack v. Stack, 646 So.2d 51, 56 (Ala.Civ.App.1994). Rule 70A, Ala. R. Civ. P., has governed contempt proceedings in civil actions since July 11, 1994. Rule 70A(a)(2)(D) defines ‘civil contempt’ as a ‘willful, continuing failure or refusal of any person to comply with a court’s lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with.’”
Stamm v. Stamm, 922 So.2d 920, 924 (Ala. Civ.App.2004).
Although the father had failed to pay any postminority educational support for the daughter by the time of trial, the evidence reflected that the parties had planned to have the daughter take out *46 student loans to pay her expenses and to have the father pay the appropriate portion of those student loans at the conclusion of the daughter’s education. The dispute between the parties over the extent of the father’s liability for expenses arose at the time the daughter informed the father that her student loans were soon due for payment and the father objected to the $62,000 figure the daughter provided him without documentation. We agree with the trial court’s apparent estimation that the father in this case refused to accept an obligation for which he admitted he was responsible. However, because, as the daughter admitted, the father did have the right to object to certain expenses that he would not be obligated to pay, we cannot agree that the father was in contempt of any order of the trial court when he insisted on documentation of the daughter’s tuition expenses before he agreed to pay $62,000. Although we did not ultimately agree with any of the father’s arguments regarding the limits he believed existed on his duty to pay postminority educational support, the father was entitled to make those arguments, just as the daughter was entitled to refute them. Thus, we find no evidence supporting a conclusion that the father had wilfully refused to pay postmi-nority educational support in violation of a court order, and we reverse that portion of the trial court’s judgment holding the father in contempt of court. The trial court punished the father for his contempt by ordering that the father pay the daughter’s attorney an attorney fee of $1,500. Because we are reversing the trial court’s judgment insofar as it held the father in contempt, we must also reverse that portion of the judgment imposing the attorney fee as a sanction for that contempt.
The daughter requests an attorney fee on appeal. In light of the father’s partial success on appeal by securing a reversal of the contempt finding against him and the reversal of the imposition of an attorney-fee at trial based upon that finding, we deny the daughter’s request.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN and MOORE, JJ., concur in the result, without writings.

. That provision actually referred to the daughter as a minor child, but the father admits that the provision was not limited to providing postsecondary education only during the daughter's minority.

. The father also mentions in his brief to this court that the daughter estimated her clothing expenses. However, at trial, the daughter disclaimed any entitlement to have the father pay her for her clothing expenses. Therefore, we will not address the daughter’s clothing expenses further.